IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NESTOR C. DOMINGO,<br><br>             Plaintiff,<br><br>    v.<br><br>PATRICK R. DONAHOE,<br><br>             Defendant.                              / | No. C13-04151 CRB<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

Pro se plaintiff Nestor Domingo has brought a series of lawsuits against his former employer, the United States Postal Service ("Postal Service"). See Civil Action No. C11-5333 CRB ("Domingo I"); Civil Action No. C13-4150 CRB ("Domingo II"); Civil Action No. C13-4151 CRB ("Domingo III"). The Court granted summary judgment for the Postal Service in Domingo I in October 2013. See Order re MSJ in Case No. C11-5333 CRB (dkt. 145). Following a February 2014 order dismissing all of Domingo II and most of Domingo III, the only claim remaining in any of the three cases was for violation of the Rehabilitation Act in connection with the Postal Service's demand that Domingo attend a third fitness for duty exam ("FFDE") after, he alleged, his treating mental health specialists had cleared him to work. See Order re MTDs (dkt. 44); Compl. (dkt. 1) at 17.[1] The Postal Service now

---

[1] The Postal Service failed to address this claim in its motion to dismiss, and argued unpersuasively at the motion hearing that the claim should be dismissed based on res judicata. See Order re MTDs at 23.

moves for summary judgment on the one remaining claim. See generally MSJ (dkt. 108).[2] Because the Postal Service's demand that Domingo attend a third FFDE was job-related and consistent with business necessity, the Court will grant summary judgment for the Postal Service.

## I. BACKGROUND[3]

### A. Domingo's Job

Domingo worked as a rural letter carrier for the Postal Service from about 1990 to 2008. Gibbs Decl. (dkt. 109) Ex. D. As a rural letter carrier, Domingo's duties included sorting mail, receiving and loading mail, delivering mail, collecting mail, furnishing routine information concerning postal matters to customers, and preparing daily trip reports. Saba Decl. (dkt. 111) Ex. B. Domingo testified in his deposition that some of his deliveries involved personal interaction with customers, as when express and priority mail required a customer's signature, or another business on his route requested delivery directly to the receptionist. Wang Decl. (dkt. 112) Ex. A at 43:7-44:20 (Domingo depo.).[4] Assignments or

---

[2] Domingo suggests at a couple of different points in his Opposition brief that his "rights to privacy of his personal medical information and records under the Fifth and Fourteenth Amendments" are also at issue. See, e.g., Opp'n (dkt. 120) at 2, 11. He is incorrect. His Complaint never raised those issues, and this Court's February 2014 Order specified that the Rehabilitation Act claim was the only one remaining. See generally Compl.; Order re MTDs at 27-28. Indeed, Domingo elsewhere in his Opposition brief acknowledges that "One issue remains on whether the Defendant's 3rd FFDE requirement on Plaintiff is an impermissible medical inquiry in violation of Rehabilitation Act despite the unequivocal reports and assurances from Plaintiff's medical mental health's specialists that the Plaintiff is fit for duty." Opp'n at 3.

[3] Domingo's EEO complaint and litigation history vis-a-vis the Postal Service are detailed elsewhere. See, e.g., Order on MTDs at 2-8; See Order re MSJ in Case No. C11-5333 CRB at 1-3. This section includes only facts relevant to Domingo's Rehabilitation Act claim.

[4] Domingo objects to the use of his deposition transcript, arguing that the Postal Service "had the transcript more than a month before [he] was properly notified of its availability," and that he did not have an interpreter present for his deposition. Opp'n at 22-23. Domingo previously moved to suppress the use of his deposition, and Magistrate Judge Maria-Elena James denied that motion without prejudice. See Motion to Suppress (dkt. 88); Discovery Order (dkt. 89). This Court also denies Domingo's effort to bar the use of his deposition. First, Domingo fails to demonstrate any prejudice stemming from the alleged administrative issues he encountered accessing his deposition transcript. Moreover, Domingo was aware as of December 18, 2014 that the deposition transcript was available, see Domingo Decl. (dkt. 121) Ex. X at 2, the Postal Service offered him nearly two months to review it and make corrections, and Domingo failed to make any corrections, Second Wang Decl. (dkt. 124) ¶ 4; Ex. K. (Domingo also objects to the Second Wang and Second Saba declarations, arguing that they are late under Civil Local Rule 7-2. See Objections (dkts. 126, 127). Those declarations are permissible

2

1 adjustments to routines—including special deliveries, late receipt of mail to be delivered,
2 need for coverage for absent employees—occurred daily and throughout the day. Saba Decl.
3 ¶ 5. Postal employment requires regular and ongoing communication between coworkers, as
4 well as continuous supervision and instruction from supervisors. Id.

### B. Postal Service Policy on Fitness for Duty Examinations

The purpose of Postal Service fitness for duty examinations is to ascertain whether an employee is medically capable of meeting the requirements of his job. Saba Decl. Ex. A at 1. The Postal Service's policy provides that "Management may request a fitness-for-duty examination and repeat examinations as necessary to safeguard the employee and coworkers when there is concern about an employee's ability to perform his or her job, based on the observations of a supervisor, manager, or medical personnel." Id. The policy states the following about psychiatric examinations:

> The psychiatric examination is not under usual circumstances requested without a prior, general fitness-for-duty examination. As a result of the initial fitness-for-duty examination, the examining physician may determine that there is the need for additional evaluation concerning the employee's mental status. If so, the employee is required to submit to a mental status evaluation.

Id. at 8.

### C. Domingo's Fitness For Duty Examinations

On April 19, 2007, Napa Postmaster Patricia Santos-Armstrong contacted Aftim Saba, M.D., then the Associate Medical Director of the Medical Unit for the Postal Service's Bay Valley District, about Domingo's behavior. See Saba Decl. Ex. C. Santos-Armstrong's email explained that Domingo had a conflict with a co-worker that had become so intense that the co-worker asked that his work area be moved away from Domingo's; that Domingo

---

under Civil Local Rule 7-3(c).) Second, the Postal Service offered to make an interpreter available for Domingo's deposition, and Domingo did not request one. See Second Wang Decl. Ex. L ("On October 3, 2014 and in my letter dated September 26, 2014, I offered to make a Tagalog interpreter available for your deposition, upon plaintiff's request. To date, I have not received such a request, and thus, I will assume that you do not require the services of an interpreter at the deposition."). Domingo proceeded with his deposition without requesting to stop due to a need for an interpreter. Second Wang Decl. ¶ 3. Moreover, Domingo testified at his deposition that at least fifty percent of his college classes were conducted in English, that "most" of his high school classes were taught in English, that he worked for 17 years at a bank where the business was conducted in English, and that there were no interpreters present for any of his appointments at Kaiser. Id. Ex. I at 24:6-25:4, 27:16-30:5; Ex. J at 230:21-231:4.

1   stated that he heard voices coming from the back of his vehicle; that several carriers reported
2   that they felt uncomfortable and threatened by Domingo and that they "[b]elieve he is both
3   angry and crazy, and concerned that he [may] still be carrying a gun"; and that Domingo's
4   behavior had changed from friendly to "extremely withdrawn and non-communicative." Id.
5   Dr. Saba responded that it appeared that a fitness for duty examination was appropriate, and
6   asked Santos-Armstrong to fill out a Form 2492 (Request for Fitness-for-Duty Examination)
7   and to include any "other relevant info such as statements from co-workers or supervisors."
8   Id.

9   An April 24, 2007 Form 2492 includes a letter from Domingo's co-worker, Melanie
10  Tull, and his supervisor, Jeff Tillotson. Id. Ex. D. Tull wrote that Domingo asked her what
11  she was doing at his house (when she had presumably not been there), that he told a co-
12  worker that he heard voices coming from the back of his vehicle, that "before he stopped
13  talking to everyone, he would always think people were talking about him," and that she was
14  concerned about his "snap[ping] at any moment" and his ownership of a gun. Id. at 2-3.
15  Tillotson described how Domingo would not look at him or "acknowledge that he has even
16  heard me when I greet him," that another carrier had asked to be moved to another area
17  because he was afraid of Domingo, who "was acting strange," and that "most of the carriers
18  do not feel comfortable in the work environment around [Domingo]." Id. at 4.

19  On May 2, 2007, Tillotson sent Domingo a letter directing him to report for a fitness
20  for duty examination with Dr. Saba on May 3, 2007, "to evaluate whether you are capable of
21  safely performing the duties and responsibilities of your position." Saba Decl. Ex. E. On
22  May 3, 2007, Dr. Saba conducted a fitness for duty exam of Domingo. Saba Decl. ¶ 8. Dr.
23  Saba states in his declaration that Domingo told him that he was being harassed, and that the
24  main example of that harassment is that "he heard voices all the time." Id. Specifically:

> According to Mr. Domingo, these voices came from underneath the dashboard of his postal delivery vehicle . . . and the voices discussed his activities in detail, such as where Mr. Domingo made a U-turn, when and where he ate lunch, and what mail he delivered, as well as aspects of his personal life, such as his balding, discussions he had with his wife at home, and that his son is "retarded." Mr. Domingo also reported that he heard voices while walking down the ramp at the Franklin Station and that "they" were discussing him all the time. At home, Mr. Domingo heard his neighbors discussing his work and

4

> private affairs. Mr. Domingo told ne that he believed that he was being bugged.

Id. Dr. Saba concluded that Domingo suffered from delusion. Id. ¶ 9. He found that Domingo had poor judgment and "no insight," and that Domingo's mental state could potentially impact the safety of his co-workers and customers. Id. Dr. Saba deemed Domingo not fit for duty pending a fit for duty exam by a psychiatrist. Id.; Ex. F ("I agree there are significant issues noted and therefore . . . Mr. Domingo needs a Psychiatric FFD done ASAP.").

Dr. Saba scheduled Domingo to be evaluated by Dr. Stephen Raffle, M.D., a board-certified psychiatrist. Id. Dr. Saba wrote a letter to Dr. Raffle, authorizing Dr. Raffle to do a psychiatric evaluation of Domingo, and summarizing the events that led to the referral. Saba Decl. Ex. H. He specifically asked Dr. Raffle to determine "in what mental capacity this employee can perform and whether Mr. Domingo is a threat to himself or others." Id. at 3. On May 8, 2007, Domingo was given a copy of Dr. Saba's May 4, 2007 letter as well as the Medical Unit's file on Domingo. Saba Decl. ¶ 12, Ex. I.

On two occasions in June and July of 2007, on his own initiative, Domingo visited psychologist Robert Kaplan, Ph.D., to get a further opinion on his fitness for duty. Saba Decl. ¶ 16. Dr. Kaplan was not Domingo's treating psychologist. Id. Ex. K. During his interview with Dr. Kaplan, Domingo denied that he heard voices "all the time," but said that he on three occasions heard voices that sounded like they were coming from a CB radio in his postal vehicle. Id. Ex. K at 194-95.[5] Domingo denied many of the comments Dr. Saba attributed to him, and described his long history of problems with Tillotson. Id. at 1196-98. Dr. Kaplan administered psychological testing, and reported that Domingo "may have tried to present himself in a positive light, possibly minimizing faults or problems." Id. at 197. But he found that there was no suggestion of "psychotic, paranoid, impulsive or delusional thoughts or behaviors." Id. Dr. Kaplan concluded that Domingo suffered from depression and anxiety but that he "is psychologically fit to resume his full duties as a regular rural

---

[5] Domingo subsequently testified that his postal vehicle was in fact not equipped with a CB radio. Wang Decl. Ex. A at 46:21-47:18.

5

carrier." <u>Id.</u> at 199.

On August 9, 2007, Dr. Raffle performed the psychiatric fitness for duty examination of Domingo that Dr. Saba had authorized; it included a psychiatric interview and psychological testing. Saba Decl. ¶ 13, Ex. J.[6] Dr. Raffle documented in an August 15, 2007 report that Domingo denied telling Dr. Saba about hearing voices, but reaffirmed his belief that he was being bugged; he asserted that Tillotson and Tull had installed a "squawk box" in his vehicle and were thus able to overhear everything he said and did. <u>Id.</u>, Ex. J at 289. Dr. Raffle noted that Domingo's thinking was "fragmented" at times and that Domingo became tangential and circumstantial in his thought production. <u>Id.</u>, Ex. J at 295. Domingo's responses in the psychological testing resulted in a "Fake-Good" profile, indicating that Domingo was trying to hide the existence of genuine psychopathology. <u>Id.</u>, Ex. J at 296. Dr. Raffle concluded that Domingo was suffering from delusional beliefs of persecution and paranoid psychosis. <u>Id.</u> ¶ 14, Ex. J at 300. He diagnosed Domingo with "Psychotic Disorder NOS [not otherwise specified] paranoid type with delusions and hallucinations," and concluded that Domingo was "not fit for duty and will not be fit for the indefinite future." <u>Id.</u> ¶ 15, Ex. J at 298, 303. He explained that Domingo's delusional beliefs interfered with his ability to interact with others and that his mental condition caused emotional instability: "due to his paranoid psychosis, [Domingo] is not able to make the adjustments to routines during the day. He is more likely to misperceive directives and constructive criticism as persecution. . . . This creates conflict between him and his coworkers and superiors." <u>Id.</u>, Ex. J at 302. Dr. Raffle did not consider Domingo a current threat, but stated that Domingo's condition "is potentially unstable and individuals with paranoid delusional disorders are more likely to have the delusional system ripen and perhaps have that translate to violent behavior towards self or others." <u>Id.</u>, Ex. J at 302-03.

On August 27, 2007, Dr. Saba forwarded Dr. Raffle's report to Dr. Kaplan. <u>See</u> Saba

---

[6] Domingo brought Dr. Kaplan's report to his examination with Dr. Raffle, and Dr. Raffle considered the report and forwarded it to Dr. Saba. Saba Decl. Ex. J at 284, 303; <u>see also id.</u> at 299 ("The apparent fact he has not told Dr. Kaplan or the doctors at Kaiser about the onset of his beliefs [of persecution] indicates . . . some effort on his part to minimize the irrational component and deceive the individuals who are trying to help him.").

6

1  Decl. Ex. L ("Please review Dr. Raffle['s] report and provide your narrative comments and
2  reasoned medical opinion on why you have reached a different conclusion"). On November
3  12, 2007, Dr. Kaplan responded to Dr. Saba, disputing Dr. Raffle's findings. See Saba Decl.
4  Ex. M at 2 ("I do not concur with Dr. Raffle's diagnosis of Psychotic Disorder, NOS, nor do
5  I concur with his opinion that Mr. Domingo has been trying to deceive this examiner."). He
6  reiterated his opinion that Domingo "does possess the emotional and mental stability to
7  perform his job as a rural mail carrier, as long as he is not under the supervision of Mr.
8  Tillotson." Id. at 3. He concluded that Domingo was fit for duty, despite suffering from
9  depression, which "could benefit from antidepressant medications and ongoing treatment."
10 Id.

### D. Medical Records in this Case

Dr. Kaplan's report stated that, following Domingo's May 2007 examination by Dr. Saba, Domingo visited his primary physician at Kaiser and was referred to outpatient services at Kaiser, "which he now attends on a regular basis." Saba Decl. Ex. K at 193. Dr. Kaplan reported that Domingo "was evaluated by three separate mental health professionals at Kaiser, and, unlike Dr. Saba, none of these professionals diagnosed Mr. Domingo as having any type of thought disorder, psychosis, paranoid ideation, delusions or auditory hallucinations." Id. Dr. Kaplan's report includes excerpts from notes of three encounters at Kaiser, but does not attach the referenced records. Id. at 195-96; Saba Decl. ¶ 20, 27. No details about the information which Domingo relayed to his Kaiser providers was included in Dr. Kaplan's report. See Ex. K at 193-96 (the notes do reference occupation-related stress).

Dr. Saba states in his declaration that, aside from the report from Dr. Kaplan, he never received any records from any mental health professional assessing Domingo's ability to perform his job duties. Saba Decl. ¶ 27 ("Mr. Domingo never sent me or the Medical Unit any documentation suggesting that his Kaiser mental health treatment providers had assessed his fitness [for] duty and determined him to be capable of performing his duties, or otherwise disagreed with my opinions or those of Dr. Raffle.").

Domingo does not claim to have submitted any medical records to the Postal Service,

7

1  suggesting instead that he authorized the Postal Service to access his Kaiser medical records
2  and that the Postal Service failed to do so. See Opp'n at 1 ("The issue is whether the
3  Defendant can show a legitimate job-related and business necessity for its action after
4  considering Plaintiff's recent medical records that Defendant . . . could have reviewed before
5  requiring Plaintiff to a 3rd FFDE."); see also id. at 21 ("The Postal Service did not even
6  review Plaintiff's medical records until they requested them on February 2015."). Domingo
7  points to two categorizes of authorizations.

8  First, Domingo asserts that he authorized Dr. Raffle to access his medical records for
9  one year. Opp'n at 6. There is a dispute of fact about this. Compare Domingo Decl. ¶ 9
10  ("Dr. Raffle had me sign an authorization to my medical records before he started
11  interviewing me on August 9, 2007."); and Gibbs Decl. Ex. B at 2 (October 1, 2008 letter
12  from Domingo to Mary Weidig at the Postal Service: "Nestor Domingo provided Dr. Raffle
13  access to his medical and psychiatric records at Kaiser"); with Reply (dkt. 124) at 9
14  ("evidence shows that the consent that plaintiff signed at his August 9, 2007 examination
15  with Dr. Raffle was a consent to allow Dr. Raffle to conduct the FFDE and to release the
16  results of Dr. Raffle's assessment to the Postal Service.") (citing Second Saba Decl. ¶ 6; Ex.
17  U (consent form Domingo signed on August 9, 2007); and Saba Decl. Ex. J (Raffle Report
18  referencing consent to evaluate and share results with Postal Service)). For the purposes of
19  this Motion, the Court accepts Domingo's version of the facts. See Anderson, 477 U.S. at
20  255.

21  Second, Domingo asserts that he "executed several authorizations to his medical
22  records at Kaiser to the Postal Service for a duration of one year on September 2007 so that
23  the Postal Service's assigned EEO investigator, Linda Ruggiero could investigate Plaintiff's
24  EEO complaints." Opp'n at 6. But those authorizations limit disclosure of Domingo's
25  Kaiser records to Linda Ruggiero, the EEO investigator assigned to EEO Case No. 4F-945-
26  0179-07, and specified that Ms. Ruggiero "may use the health information authorized on this
27  form for the following purposes: EEO Complaint Investigation." Patterson Decl. (dkt. 110)
28  ¶ 3, Ex. A. The Ruggiero releases, therefore, did not provide the Postal Service with access

8

to all of Domingo's Kaiser records.

Importantly, even assuming that the Postal Service could have accessed Domingo's Kaiser records via the consent form Domingo signed with Dr. Raffle, Domingo has not identified any entry or note in those records that demonstrates that his Kaiser doctors had unequivocally cleared him for duty. See Reply at 5-6.[7] The Postal Service also notes that there is no evidence that Domingo completed mental health treatment by January 2008, and that, in fact, Dr. Kaplan in November 2007 described Domingo's treatment as "ongoing." See Saba Decl. Ex. M at 3.

### E.     Domingo's Termination and this Litigation

Dr. Saba asserts in his declaration that he reviewed the reports of Dr. Raffle and Dr. Kaplan, and Dr. Kaplan's November 2007 letter. Saba Decl. ¶ 24. Although he agreed with Dr. Raffle's conclusions, Dr. Saba "treated Dr. Kaplan's report as a second opinion," and, in order to resolve the conflicting opinions of Dr. Raffle and Dr. Kaplan, determined that a third opinion with a different psychiatrist was necessary. Id.

On January 3, 2008, Dr. Saba sent Domingo a list of five psychiatrists and asked Domingo to choose one for his "third opinion psychiatric evaluation at USPS expense." Id. ¶ 25; Ex. N. Domingo failed to respond, and Dr. Saba sent him a second letter on January 23, 2008. Saba Decl. ¶ 25; Ex. O. Domingo agreed to attend a third fitness for duty exam and proposed two psychiatrists, not included on Dr. Saba's list, for the examination. Saba Decl. ¶ 25. Dr. Saba was unable to find a listing for one doctor, and the other was unavailable due to his own medical condition. Id. On April 11, 2008, the Postal Service

---

[7] The record before the Court contains just two documents that could possibly be characterized as Kaiser records. Domingo attaches both to his declaration. See Domingo Decl. Exs. V, W. A July 2009 letter from Dr. Brown and Dr. Wilson of Kaiser states that Domingo's "primary mode of treatment has been participation in our Job Stress Group," since June 2007. Patterson Decl. Ex. B. It states that Domingo met with an individual therapist "as needed" and "spoke briefly with the group leaders after the group, as needed" and that they "have found no evidence of psychosis or other major mental disorder which would prevent him from performing his usual duties as a postal employee." Id. An August 2009 letter from Dr. Mary Spence at Kaiser states that she met with Plaintiff for four sessions (between May 2007 and August 2009), upon his referral for occupational stress and anxiety. Id. Ex. C. Dr. Spence asserted that "[a]t no time during this period to date has there ever been any evidence or suggestion that Mr. Domingo has a psychotic disorder or any psychotic symptoms." Id. Both letters post-date the date that the Postal Service demanded a third FFDE and the date of termination.

9

asked Domingo to select one of the five psychiatrists originally included in Dr. Saba's January 3, 2008 letter. Wang Decl. Ex. D. Domingo did not respond, and on May 1, 2008, the Postal Service sent Domingo's then-lawyer a letter stating, "If I do not hear back from you today with the name of the doctor that Mr. Domingo has chosen from the list of five that Dr. Saba sent him (months ago), I have instructed Dr. Saba to choose the doctor with the soonest availability." Wang Decl. Ex. E. Domingo did not respond, and Dr. Saba scheduled a fitness for duty exam with Dr. Lieberman on May 15, 2008. Saba Decl. ¶ 26. Dr. Saba notified Domingo of this appointment on May 6, 2008. Saba Decl. Ex. P. Domingo did not appear for the scheduled fitness for duty exam. Saba Decl. ¶ 26.

On September 18, 2008, the Postal Service issued a Notice of Proposed Separation, explaining that because Domingo refused to attend the third opinion fitness for duty exam, he was still deemed unfit for duty. Gibbs Decl. ¶ 2, Ex. A. Domingo responded to the Notice, asserting that none of his mental health providers agreed with Dr. Saba or Dr. Raffle, although he did not refer to any of his providers by name or include any medical records, letters, or reports with his letter. Gibbs Decl. Ex. B at 2, 3 ("Nestor Domingo's doctors at Kaiser continue to regularly see him. From the start to this date, none of these highly regarded mental professionals agree with [Drs. Saba or Raffle]."). On October 10, 2008, the Postal Service issued a Letter of Decision—Notice of Proposed Separation, determining that separation was appropriate. Gibbs Decl. Ex. C. Pursuant to the Letter of Decision, Domingo's termination was effective October 26, 2008. Id., Ex. D.[8]

The Rehabilitation Act claim at issue here stems from one of six EEO proceedings Domingo commenced against the Postal Service. See Mot. at 14-16. Following the Court's February 2014 order, it is the only claim remaining. See Order re MTDs. The Postal Service now moves for summary judgment on it. See generally MSJ.

## II.  LEGAL STANDARD

The Court can grant a motion for summary judgment "if the movant shows that there

---

[8] Domingo argues that there is a dispute of fact about his actual date of termination. Opp'n at 10. If there is such a dispute, it is not material.

10

1  is no genuine dispute as to any material fact and the movant is entitled to judgment as a
2  matter of law." Fed. R. Civ. Proc. 56(a). A principal purpose of summary judgment "is to
3  isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317,
4  323-24 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could
5  return a verdict" for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
6  A fact is material if it could affect the outcome of the suit under the governing law. Id. at
7  248-49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). To
8  determine whether a genuine dispute as to any material fact exists, the court must view the
9  evidence in the light most favorable to the non-moving party. Id. at 255.

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citation omitted). Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." See id.

### III. DISCUSSION

The ADA sets limits on when a qualified employer may require a medical examination to determine whether an employee has a disability. 42 U.S.C. § 12112(d)(4); 29 C.F.R. § 1630.14(c). Inquiries are permissible so long as they are "job-related and consistent with business necessity." Id. The Ninth Circuit has explained that "[t]he business necessity standard is quite high," Cripe v. City of San Jose, 261 F.3d 877, 890 (9th Cir. 2001), and the burden of establishing business necessity falls on the employer, Fredenburg v. Contra Costa Cnty. Dept. of Health Serv., 172 F.3d 1176, 1182 (9th Cir. 1999). Nonetheless, courts "will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his . . . duties." Conroy v. New York State Dept. of Corr. Servs., 333 F.3d 88, 98 (2d Cir. 2003).

Domingo's Complaint alleged that the Postal Service's insistence on his attending a

11

third fitness for duty for exam after "Plaintiff's treating mental health professionals provided unequivocal clearances that Plaintiff is fit for duty . . . and . . . did not suffer from medical condition that would affect safety to himself or to others, or would otherwise interfere with his ability to perform as a rural letter carrier" was an impermissible disability-related inquiry in violation of the Rehabilitation Act and the ADA guidelines. Compl. at 17-21. But the evidence did not support Domingo's allegations. Domingo did not supply the Postal Service with "unequivocal clearances" from treating mental health specialists. Domingo provided the Postal Service with a report from a consulting physician, Dr. Kaplan, which referenced but did not include records of Domingo's Kaiser treatment. See Saba Decl. Ex. K at 195-96.

Certainly, Dr. Kaplan's report concluded that Domingo was fit for duty. Id. at 199 ("it is my opinion that Mr. Domingo is psychologically fit to resume his full duties as a regular mail carrier."). But that report was bookended by fitness for duty exams by Dr. Saba and Dr. Raffle. Dr. Saba reported that Domingo told him that "he heard voices all the time" and that Domingo believed that he was being harassed. Saba Decl. ¶ 8. Dr. Saba found Domingo delusional and a potential risk to the safety of his co-workers and customers. Id. ¶ 9. Dr. Raffle reported that Domingo believed that he was being bugged with a "squawk box," had "irrational and delusional" beliefs that he was being persecuted, and had tangential and circumstantial thought production. Id. ¶ 13, Ex. J at 288-89, 300. Moreover, Dr. Raffle found Domingo's condition "potentially unstable" and capable of ripening into violence. Id. at 301. The Postal Service had also received other evidence calling into question Domingo's ability to perform his duties. Domingo's co-worker, Tull, stated that Domingo told a co-worker that he heard voices coming from the back of his vehicle, and that she was concerned about his "snap[ping] at any moment." Saba Decl. Ex. D at 2-3. His supervisor, Tillotson, described how Domingo would not look at him, that one carrier was afraid of Domingo, who "was acting strange," and that "most of the carriers do not feel comfortable" around him. Id. at 4.

There was therefore a conflict between the accounts of Dr. Kaplan on the one hand

12

1 and of Dr. Saba, Dr. Raffle, Tull and Tillotson on the other.[9] Domingo argues that
2 "Defendant has the duty to obtain Plaintiff's most recent medical records if they believe that
3 is what they need but failed to do so." Opp'n at 19, 20, 25. But Domingo points to no
4 relevant authority establishing that legal duty. See id. at 19 (relying on regulation and two
5 cases involving ALJ's duties to develop record in social security cases). Nor has he pointed
6 to any evidence that his medical records in early 2008, when the Postal Service ordered the
7 third fitness for duty exam, contained an unequivocal determination that he was fit for duty.[10]
8 Nevertheless, even assuming that the authorization Domingo signed for Dr. Raffle allowed
9 the Postal Service to obtain Domingo's Kaiser records, and even assuming that those records
10 contained an unequivocal determination that Domingo was fit for duty (or that he had
11 successfully completed mental health treatment), there would still be a conflict with the
12 evidence provided by Dr. Saba, Dr. Raffle, Tull and Tillotson.

13 Dr. Saba's decision to obtain a third opinion fitness for duty examination as a means
14 of resolving that conflict was entirely appropriate. See Saba Decl. ¶ 24. The Ninth Circuit
15 has held that an employer may request another fitness for duty examination where a first
16 examination found the employee unfit, and the employee subsequently submits a report by a
17 treatment provider stating that the employee is fit. See Brownfield v. City of Yakima, 612
18 F.3d 1140, 1145 (9th Cir. 2010). Domingo seeks to distinguish Brownfield, arguing that he
19 "never had an outburst, never had an altercation, was never described to be out of control, did
20 not have job performance or attendance problem." Opp'n at 12. In fact, there is evidence
21 that Domingo had an altercation with a coworker, see Saba Decl. Ex. C (describing conflict
22 with coworker that "became so intense that the other worker requested" to move), and that
23 his coworkers "[b]elieve he is both angry and crazy," id. But the business necessity standard

---

[9] The Court thus rejects Domingo's assertion that "[d]uring the relevant time period in this claim, no conflicting opinions existed." See Opp'n at 21; see also id. at 23 ("By way of Dr. Saba's judicial admission in his declaration that he was just reviewing Plaintiff's medical records for the first time after they were just recently subpoenaed on February 2015, the Defendant cannot argue that conflict of opinions between doctors existed and necessitated the required 3rd FFDE on Plaintiff."). The conflict came from Dr. Kaplan's report, not from Domingo's medical records.

[10] Indeed, Domingo testified that he could not recall if he had ever requested any of his treating mental health providers to evaluate whether he was fit for duty. Wang Decl. Ex. A at 80:12-82:25.

13

1  can be met even before an employee's work performance declines if there is significant
2  evidence that could cause a reasonable person to inquire whether an employer is capable of
3  performing his job. See Brownfield, 612 F.3d at 1146.  An employee's ability to handle
4  reasonably necessary stress and to work with others is an essential function of any position.
5  See Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1311-12 (11th Cir. 2013) (internal
6  quotation marks omitted).  Domingo's position required that he interact with customers,
7  Wang Decl. Ex. A at 43:7-44:20, make adjustments to his routines, and communicate with
8  his coworkers, Saba Decl. ¶ 5.  There was significant evidence that could cause a reasonable
9  person to inquire whether Domingo was capable of continuing to work as a rural letter
10 carrier.  See Brownfield, 612 F.3d at 1145 (citing approvingly Mickens v. Polk County Sch.
11 Bd., 430 F. Supp. 2d 1265, 1280 (M.D. Fla. 2006), which held that "psychological
12 examination of an employee is both job-related and consistent with a business necessity if
13 that employee exhibits even mild signs of paranoid or agitated behavior that causes the
14 school administration to question the employee's ability to perform essential job duties");
15 Rodriguez v. Sch. Bd. of Hillsborough Cnty., Fl., — F. Supp. 3d —, 2014 WL 5100635, at
16 *3-4 (M.D. Fla. Oct. 9, 2014) ("Defendant's requirement that Dr. Jones, who conducted the
17 first FFD evaluation, re-evaluate Plaintiff before her return to work was reasonable.").  There
18 was also some cause to be concerned about the safety of Domingo's coworkers and
19 customers, further justifying a third fitness for duty exam.  See Saba Decl. ¶ 9; Saba Decl.
20 Ex. J at 302-03; Krocka v. City of Chicago, 203 F.3d 507, 515 (7th Cir. 2000) ("We have
21 stated that where inquiries into the psychiatric health of an employee are job related and
22 reflect a concern with the safety of employees, the employer may . . . require that the
23 employee undergo a physical examination designed to determine his ability to work.")
24 (internal quotation marks omitted).
25        The Postal Service's demand that Domingo attend a third fitness for duty exam was
26 job-related and consistent with business necessity.  It was not a violation of the
27 Rehabilitation Act.
28 //

14

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Postal Service's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: April 13, 2015

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE